Ms. Jennifer Parker Interim General Counsel Department of Juvenile Justice 2737 Centerview Drive Tallahassee, Florida 32399-3100
Mr. Michael Olenick General Counsel Department of Education The Capitol Tallahassee, Florida 32399-0400
Dear Ms. Parker and Mr. Olenick:
On behalf of the Department of Juvenile Justice and the Department of Education, you request the opinion of this office on substantially the following question:
Do the quality assurance programs of the Department of Juvenile Justice for juvenile delinquency programs provide similar controls and safeguards for juveniles housed in residential juvenile justice programs as those currently provided for children in facilities licensed by the Department of Children and Families pursuant to section 409.175, Florida Statutes?
In sum:
The quality assurance programs of the Department of Juvenile Justice for juvenile delinquency programs, which include a quality assurance review pursuant to section 985.412, Florida Statutes, provide similar controls and safeguards for juveniles housed in residential juvenile justice programs as those currently provided for children in facilities licensed by the Department of Children and Families pursuant to section 409.175, Florida Statutes.
The Department of Juvenile Justice (DJJ) is attempting to obtain funding from the United States Department of Agriculture National School Lunch Program (NSLP) for juvenile delinquency facilities in the State of Florida that are run pursuant to a contract with DJJ. You state that when these programs were under the former Department of Health and Rehabilitative Services, they received NSLP funding. However, with the transfer of these programs to DJJ, the issue has been raised whether participation in the NSLP is still permissible.
You state that to be eligible for NSLP funds, a residential child care institution must meet the definition of the term "School" in section 210.2(c), Chapter 7 of the Code of Federal Regulations, which states in part:
"(c) any public or nonprofit private residential child care institution, or distinct part of such institution, which operates principally for the care of children, and, if private, is licensedto provide residential child care services under the appropriatelicensing code by the State or a subordinate level of government, except for residential summer camps which participate in the Summer Food Service Program for Children, Job Corps centers funded by the Department of Labor, and private foster homes. The term "residential child care institutions" includes, but is not limited to: homes for the mentally, emotionally or physically impaired, and unmarried mothers and their infants; group homes; halfway houses; orphanages; temporary shelters for abused children and for runaway children; long-term care facilities for chronically ill children; and juvenile detention centers."[1] (e.s.)
While residential programs operated by DJJ clearly would qualify under the above definition, you state that a question has arisen whether DJJ's contract providers running the state juvenile justice programs, often in state-owned building, meet this definition.
Prior to the creation of DJJ, delinquency services were provided by the former Department of Health and Rehabilitative Services (HRS). You state that while you have been unable to identify any specific authority for licensure of these facilities under the former HRS statutes, delinquency service providers in place prior to the creation of DJJ were able to receive school lunch money.
The United States Department of Agriculture, which oversees the National School Lunch Program, has indicated a concern that the protections for juveniles in DJJ's programs be similar to those provided under a state regulatory licensure scheme such as section409.175, Florida Statutes, which requires the Department of Children and Families (DCF) to adopt licensing rules for residential child-caring facilities.[2]
When it created DJJ in 1994, the Legislature authorized residential juvenile justice facilities operated by private providers to be administered by contract with DJJ rather than by licensure.[3] The statutes require that all personnel of the contract provider, including the owners, operators, employees, and volunteers in the facility or providing the service or program, must be of good moral character.[4] In addition, employment screening pursuant to Chapter 435, Florida Statutes, using the level 1 standards for screening set forth in that chapter, is required for personnel in delinquency facilities, services, and programs.[5]
Moreover, each programmatic, residential, and service contract or agreement entered into by DJJ must include a cooperation clause to comply with DJJ's "quality assurance requirements, cost-accounting requirements, and the program outcome evaluation requirements."[6]
Section 985.412, Florida Statutes, requires DJJ to:
"1. Establish a comprehensive quality assurance system for each program operated by the department or operated by a provider under contract with the department. Each contract entered into by the department must provide for quality assurance.
2. Provide operational definitions of and criteria for quality assurance for each specific program component.
3. Establish quality assurance goals and objectives for each specific program component.
4. Establish the information and specific data elements required for the quality assurance program.
5. Develop a quality assurance manual of specific, standardized terminology and procedures to be followed by each program.
6. Evaluate each program operated by the department or a provider under a contract with the department and establish minimum thresholds for each program component. If a provider fails to meet the established minimum thresholds, such failure shall cause the department to cancel the provider's contract unless the provider achieves compliance with minimum thresholds within 6 months or unless there are documented extenuating circumstances. In addition, the department may not contract with the same provider for the canceled service for a period of 12 months. If a department-operated program fails to meet the established minimum thresholds, the department must take necessary and sufficient steps to ensure and document program changes to achieve compliance with the established minimum thresholds. If the department-operated program fails to achieve compliance with the established minimum thresholds within 6 months and if there are no documented extenuating circumstances, the department must notify the Executive Office of the Governor and the Legislature of the corrective action taken. Appropriate corrective action may include, but is not limited to:
a. Contracting out for the services provided in the program;
b. Initiating appropriate disciplinary action against all employees whose conduct or performance is deemed to have materially contributed to the program's failure to meet established minimum thresholds;
c. Redesigning the program; or
d. Realigning the program."[7]
Thus, DJJ is statutorily required to establish quality assurance criteria for each specific program component as well as to establish the goals and objectives for such components. Each juvenile justice program must be evaluated for compliance with the minimum thresholds of performance established by DJJ. You state that DJJ has developed quality assurance standards for all residential programs and that a quality assurance review team evaluates each program. Each review team includes an educator who represents the Department of Education and is responsible for reviewing the treatment program's educational component.
If the provider fails to meet the established minimum thresholds, DJJ may cancel the provider's contract unless the provider achieves compliance within six months or unless there are documented extenuating circumstances. You further state that, like section 409.175, Florida Statutes, DJJ's quality assurance standards require the respective facilities to be inspected once a year. Like DCF's licensees under section 409.175, Florida Statutes, DJJ contract providers, as noted above, must be of good moral character and are subject to background screening. Unlike DCF licensees, however, DJJ contract providers, and their employees, have been designated as agents of the state for purposes of section 768.28, Florida Statutes, while acting within the scope of and pursuant to guidelines established in the contract or by rule.[8]
Thus, DJJ is authorized to regulate its contract providers through its quality assurance program. Such regulation would appear to be similar to that required for facilities licensed by the DCF pursuant to section 409.175, Florida Statutes. An examination of the standards for residential juvenile facilities, except boot camps, indicates that the standards adopted relate to: facility structure and environment; program management, leadership, and community relations; admission and orientation; living and treatment environment; case management and treatment services; behavior management and disciplinary practices; food services; health services; program security; transitional planning, release and transfer procedures; aftercare services; staff development and training; program safety and emergency procedures; and educational services.[9]
Accordingly, I am of the view that the quality assurance programs of the Department of Juvenile Justice for juvenile delinquency programs, which include a quality assurance review pursuant to section 985.412, Florida Statutes, provide similar controls and safeguards for juveniles housed in residential juvenile justice programs as those currently provided for children in facilities licensed by the Department of Children and Families pursuant to section 409.175, Florida Statutes.
Sincerely,
Robert A. Butterworth Attorney General
RAB/tjw
[1] And see, 42 U.S.C. s. 1760(d)(3) defining school for purposes of the school lunch programs as:
"(A) any public or nonprofit private school of high school grade or under, and (B) any public or licensed nonprofit private residential child care institution (including, but not limited to, orphanages and homes for the mentally retarded, but excluding Job Corps Centers funded by the Department of Labor). For purposes of this paragraph, the term "nonprofit", when applied to any such private school or institution, means any such school or institution which is exempt from tax under section 501(c)(3) of Title 26."
[2] According to s. 409.174(4)(a), Fla. Stat., licensing requirements must include:
"1. The operation, conduct, and maintenance of these homes and agencies and the responsibility which they assume for children served and the evidence of need for that service.
2. The provision of food, clothing, educational opportunities, services, equipment, and individual supplies to assure the healthy physical, emotional, and mental development of the children served.
3. The appropriateness, safety, cleanliness, and general adequacy of the premises, including fire prevention and health standards, to provide for the physical comfort, care, and well-being of the children served.
4. The ratio of staff to children required to provide adequate care and supervision of the children served and, in the case of foster homes, the maximum number of children in the home.
5. The good moral character based upon screening, education, training, and experience requirements for personnel.
6. The department may grant exemptions from disqualification from working with children or the developmentally disabled as provided in s. 435.07.
7. The provision of preservice and inservice training for all foster parents and agency staff.
8. Satisfactory evidence of financial ability to provide care for the children in compliance with licensing requirements.
9. The maintenance by the agency of records pertaining to admission, progress, health, and discharge of children served, including written case plans and reports to the department.
10. The provision for parental involvement to encourage preservation and strengthening of a child's relationship with the family.
11. The transportation safety of children served.
12. The provisions for safeguarding the cultural, religious, and ethnic values of a child.
13. Provisions to safeguard the legal rights of children served."
And see, 65C-13, Fla. Admin. R., establishing standards for substitute care for children.
[3] See, s. 985.407(1), Fla. Stat., authorizing DJJ to contract with public and private agencies to carry out the delinquency services and programs of DJJ.
[4] Section 985.407(2), Fla. Stat.
[5] Section 985.407(3), Fla. Stat. See, s. 435.03, Fla. Stat., establishing Level 1 screening standards. And see, s. 985.407(4), Fla. Stat., authorizing DJJ to grant exemptions from disqualifications as provided in s. 435.07, Fla. Stat.; and s. 985.407(2), Fla. Stat., providing that a volunteer assisting on an intermittent basis for less than 40 hours per month is not required to be screened if the volunteer is under direct and constant supervision by persons who meet the screening requirements.
[6] Section 985.404(12)(d), Fla. Stat.
[7] Section 985.412(1)(c), Fla. Stat. (1998 Supp.).
[8] Section 768.28(11)(a), Fla. Stat. But see, s. 768.28(11)(b), Fla. Stat., stating that the subsection does not designate a person who provides contracted services to juvenile offenders as an employee or agent of the state for purposes of Ch. 440, Fla. Stat., the "Workers' Compensation Law."
[9] See, Quality Assurance Standards for Juvenile Justice Residential Programs, Florida Department of Juvenile Justice, Bureau of Quality Assurance, Revised December 1, 1998. And see, Department of Juvenile Justice, Boot Camps and Drill Academies, Quality Assurance Standards, Revised January 1, 1998, which covers a similar range in establishing program standards.